**AMERADA HESS CORPORATION, Plaintiff,**

v.

**M/T MARIAM, et al., Defendants.**

**HURON LIBERIAN COMPANY, Third-Party Plaintiff,**

v.

**AMERADA HESS TRADING OF ST. LUCIA, LTD., Third-Party Defendant.**

Civ. A. No. 80–0241–T.

United States District Court, S. D. Alabama, S. D.

Jan. 19, 1982.

William M. Moore, Mobile, Ala., Robert Fougner, New York City, for Amerada Hess Corp. and Amerada Hess Trading of St. Lucia, Ltd.

Abram L. Phillips, Jr., Mobile, Ala., for M/T MARIAM and Duchess Shipping Co.

A. Clay Rankin, III, Mobile, Ala., for Huron Liberian Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause was heard by this Court without a jury and taken under submission on the 30th day of October 1981. After hearing the evidence on September 30th, and October 1, 2, and 5, 1981, examining the exhibits, pleadings and stipulations, and proposed findings of facts and conclusions of law for all parties, this Court makes the following Findings of Fact and Conclusions of Law as to liability only:

## FINDINGS OF FACT

### The Parties and Their Claims

1. The plaintiff, Amerada Hess Corporation (Hess), a Delaware corporation, is the owner of an oil terminal on the Mobile River in Mobile, Alabama, and seeks recovery from defendants, Duchess Shipping Company, Ltd. (Duchess), a Liberian corporation and owner of the M/T MARIAM, and Huron Liberian Company (Huron), a fully-owned subsidiary of Standard Oil Company of Ohio (SOHIO) and the time charterer of the M/T MARIAM, for damages to its Mobile oil terminal.

2. Duchess crossclaims against Huron, seeking indemnification for any damages that it is found to owe Hess. Huron counterclaims against Hess and crossclaims against Duchess for extra port charges and expenses it incurred as a result of the MARIAM's breaking away from her mooring at the Hess Terminal, as hereinafter fully discussed.

3. Huron seeks indemnity for any damages that it is found to owe Hess by crossclaim against Duchess and by third-party action against defendant, Amerada Hess Trading of St. Lucia, Ltd. (Hess Trading), a fully-owned subsidiary of Hess and the voyage charterer of the MARIAM at the time of the breakaway. Hess Trading in turn seeks indemnity from liability by counterclaims against Huron and Duchess.

4. Duchess on August 11, 1981, less than two months prior to trial, further filed a counterclaim against Hess and crossclaims against Huron and Hess Trading for hull and machinery damage suffered by the MARIAM.

### The Charter Parties

5. On October 12, 1978, Duchess, as owner of the MARIAM, and Huron, as charter-

er, entered into a Time Charter Party. The pertinent charter party provisions are as follows:

3 . . . . .

SAFE BERTH. Charterer shall exercise due diligence to ensure that the Vessel is only employed between and at safe ports, places, berths, docks, anchorages and submarine lines where she can always lie safely afloat, but notwithstanding anything contained in this or any other clause of this Charter. Charterer shall not be deemed to warrant the safety of any port, place, berth, dock, anchorage or submarine line and shall be under no liability in respect thereof except for loss or damage caused by its failure to exercise due diligence as aforesaid.

.        .        .        .        .

9. OFF–HIRE. In addition to any recovery of hire allowed pursuant to Clause 1, in the event of loss of time,

(a) continuing for more than 24 hours, due to deficiency of personnel or stores, repairs, breakdown (whether partial or otherwise) of machinery or boilers, interference of authorities, collision or stranding or fire or accident damage to the Vessel or any other cause preventing the efficient working of the Vessel; or

(b) whether or not continuing for 24 hours,

(i) due to strikes, refusal to sail, breach of orders or neglect of duty on the part of Master, Officers or crew; or . . . .

It is understood that the cost of fuel and water consumed while the Vessel is off-hire hereunder, as well as all port charges, pilotage and other expenses incurred during such period, shall be borne by Owner.

19. CHARTER TO PROVIDE. Charterer (except during the period when the Vessel is off-hire) shall provide and pay for all fuel except for galley and crew, and all boiler water if the Vessel is a steamer. Charterer shall also pay for all port charges, light dues, dock dues, Panama and other canal dues, pilotage, consular and agency fees, except those pertaining to the Vessel, Master, Officers and crew, tugs necessary for assisting the Vessel in, about and out of port for the purpose of carrying out this charter, agencies pertaining to the cargo, commissions, expenses of loading and unloading cargoes, and all other charges whatsoever except those herein stated as payable by Owner. Owner shall reimburse Charterer for any fuel used or any expenses incurred in making a general average sacrifice or expenditure.

6. On April 12, 1979, Huron, as time charterer of the MIRIAM, and Hess Trading, as charterer, entered into a Voyage Charter Party. The pertinent provisions of this charter party are as follows:

1. PART II WARRANTY. (a) Owner warrants that at the commencement of loading hereunder the Vessel shall be classed as specified in Part I(A) and that her hull, machinery, boilers, tanks, equipment, including pipes, pumps and heating coils and facilities, shall be in good working order and condition and in every way seaworthy and fit for the carriage of the cargo specified in Part I(E) hereof, with a full and efficient complement of Master, officers and crew, so far as the foregoing conditions can be obtained by the exercise of due diligence, and that she shall be so maintained throughout her service hereunder.

.        .        .        .        .

4. LOADING AND DISCHARGE PORTS. (a) Prior to the Vessel's readiness to sail from the last previous port of call or on signing this Charter if the Vessel has already sailed, Charterer shall nominate the port(s) of loading or port(s) of discharge, . . .

.        .        .        .        .

9. LOADING/DISCHARGING PLACE. Charterer shall not be deemed to warrant the safety of any port, berth, dock anchorage and/or other place to which the vessel may be ordered to load or discharge and shall not be liable for any loss, damage, injury, or delay result-

ing from conditions at such ports, berths, docks, anchorages or other places not caused by Charterer's fault or neglect which could have been avoided by the exercise of reasonable care on the part of the Master.

7. The time charter terms provide that the MARIAM would go "off-hire" in the event of time lost due to negligence on the part of her Master, Officers or crew and that during such off-hire time the cost of all additional expenses would be borne by Duchess. The charter party further provides that Huron did not warrant the safety of any port or dock and would not be liable for any loss or damages received by the MARIAM in any such port or dock unless caused by Huron's failure to exercise due diligence. The voyage charter terms additionally provide that Duchess warrants the competence of the MARIAM's Master, Officers and crew, and that Hess Trading would not be liable for any loss, damage, injury or delay resulting from conditions of the port or dock not caused by Hess Trading or which could have been avoided by the Master's exercise of reasonable care.

### The Hess Terminal

8. The Hess terminal is located on the west bank of the Mobile River, south of Cochrane Bridge and north of Three Mile Creek. The terminal consists of several storage tanks, an office, other related facilities and a dock where vessels tie up in order to load or discharge. The docking facility is made up of three separate components: (1) A platform which extends out in the river approximately 140 feet and is used to support the cargo hoses and pipes, and provide a walking area for the Hess terminal men. (2) There is one cylindrical "breasting dolphin" on both the north and south side of the platform. They are located slightly further out in the water than the platform and are approximately 275 feet apart. These dolphins are thirty-six feet, six inches in diameter and consist of steel sheet piling driven to a depth of at least fifty-three feet. These piling have been filled with sand and concrete and each has a bollard attached to its top to be used in mooring a vessel to the dock. A vessel at berth lays against these two dolphins, rather than against the platform itself. (3) There are nine mooring bollards located at the edge of the river approximately 170 feet from the plane of the breasting dolphins. They are spaced along the rivers' edge, four north and five south of the platform, with a total distance of approximately 900 feet from the northernmost to the southernmost bollard. Each of the nine bollards consists of a 45 foot long, 14 inch steel H-Beam driven into the river bank about 39 feet, leaving the remaining six feet of the H-Beam extending above the surface. The top section is capped by a pipe fitted over the H-Beam and grouted with concrete. A cross bit goes through the upper end of the pipe cap giving each bollard a "T" shape appearance and prevents a mooring line from slipping off the top of a bollard. To each bollard is attached two one-inch steel chains, which run at an angle of about 45° apart to separate deadmen. Each deadman consists of a wooden piling driven into the ground with a concrete cap at ground level. The deadmen offer additional support to the H-Beam by providing resistance to the pull of a vessel's lines.

9. A new bollard mooring system was installed at the Hess terminal following the damages caused by the MARIAM's breakaway on April 25, 1979. The new system uses four floating buoys which are attached to shore by a steel chain. While the new buoy system is different, expert testimony indicates it does not significantly improve the docking facilities at the Hess terminal.

10. On several occasions prior to the MARIAM's arrival, ships comparable in size had successfully docked at the Hess terminal. Prior to the breakaway of the MARIAM, no vessel had ever broken away from her mooring at the Hess terminal. The Court finds the Hess terminal was capable of handling the MARIAM on April 25, 1979, and was a "safe berth" within the meaning of Provision 3 in the Time Charter Party.

## The River Current

11. On April 25, 1979, the Mobile River was in a flood stage and the river's current was very swift. There is no exact current reading for April 25, 1979, as the meter on Cochrane Bridge was not functioning. The Mobile Harbormaster, Captain W. K. Morgan, testified that the surface current (which is at least as strong as the underneath current due to the tides) was 3.2 knots.

12. The existing current conditions on April 25, 1979, did not render the Port of Mobile or the Hess terminal unsafe for the MARIAM. All existing river and current conditions were open and obvious to all parties involved, including the Master and the Port Captain of the MARIAM.

## The MARIAM and Her Arrival

13. The MARIAM is a tanker approximately 815 feet long, with a 122 foot beam and a burden of slightly over 85,000 deadweight tons. In April 1979, the MARIAM had taken on a load of Iranian light crude oil in Bonaire. The oil was loaded by Hess Trading, who was both the supplier and the shipper of the cargo. After loading the oil, the MARIAM proceeded to Mobile to discharge her cargo at the Hess terminal.

14. The MARIAM arrived at the Mobile Seabuoy around 0830 on April 25, 1979. At about 1030 Captain Joe Ollinger, a Mobile Bar Pilot, boarded the MARIAM and with the assistance of two tugs from Mobile Towing Company, she proceeded to the Hess terminal.

Captain Ollinger noted difficulty in maneuvering the MARIAM due to her size, weight and the swift current. The MARIAM arrived at the Hess terminal around 1530 and upon attempting to dock she washed off the dock on her first two approaches. During these two approaches at least one mooring line parted. On the third approach, Captain Ollinger left the bridge and personally helped the crew, which he described as not being "too lively", secure the mooring lines.

The MARIAM was secured at the Hess terminal at 1937 on April 25, 1979, by means of three bow lines to the northernmost bollard, two breast lines to one shore bollard north of the dock, one spring line to the north breasting dolphin, two spring lines to the southern breasting dolphin, three stern lines and two breast lines aft to three bollards south of the dock. (Hess Ex. 33 and Duchess Ex. 52) Only five of the nine shore bollards and the two breasting dolphins were used to secure the MARIAM.

15. Harry Bryant of Bryant Mooring Service, an independent contractor, was retained to carry the mooring lines from the ship to the various bollards on shore as instructed by the MARIAM's officers and crew. While Bryant was frequently employed as a linesman at the Hess terminal, this employment was made by the vessel's port agent and not by Hess.

16. During the docking procedure and the later events which lead up to the MARIAM's breakaway, two persons were present at all times on the Hess docking platform. One was Henry Jones, a Hess dockman, whose duties included spotting the MARIAM's manifold so that it was properly aligned with the dock hoses for discharge. The other was Captain Stavros Sorros, Duchess Port Captain, whose duties included supervising and controlling the docking of the MARIAM. While both of these two persons were present and available to testify during the course of the trial, only the testimony of Jones was offered.

17. During the docking procedure, Jones who was positioned on the docking platform, signaled to the ship's crew member stationed by the discharge manifold in order to indicate the proper placement of the manifold. Jones was unable to get the crewman to take the actions necessary to properly position the vessel for discharge. In fact, the ship's crewman simply "waved him off" as Jones tried to explain where the MARIAM needed to be positioned.

18. At approximately 1945 on April 25, 1979, the Master of the MARIAM released the tugs, discharged Captain Ollinger and shut down the vessel's main propulsion en-

gine. (Duchess Ex. 44) Captain Ollinger, who departed with the tugs, testified that the MARIAM was properly secured and stationary to the Hess dock when he left. The Court finds that as of 1945 the MARIAM was safely moored at the Hess terminal and that this fact is indicative of the adequacy of the Hess terminal and the Port of Mobile for the MARIAM under the existing conditions. The Court finds that although the MARIAM was properly secured to the dock, one major problem existed—the MARIAM was not properly aligned for discharge. Jones indicated that the manifold was about twenty to thirty feet out of alignment and north of the Hess hoses.

19. Jones informed Port Captain Sorros of the improper alignment. Captain Sorros suggested that the ship could use its boom to pull the hoses on board and reach the manifold in spite of the misalignment. Jones refused to approve such a procedure and called the Terminal Manager, Donnie Brantley, who confirmed Jones' decision, citing the potential danger of hoses being separated as the vessel floated higher in the water due to the discharge of her cargo.

20. Theodore Fillette, Huron's Mobile port agent, arrived at the Hess terminal about 1730 on April 25, 1979, and remained until after midnight when the breakaway occurred. After the decision was made that the MARIAM would have to be moved back around twenty feet, Jones, Fillette and Captain Sorros remained on the platform. At approximately 1955, Captain Sorros and the MARIAM's Master entered into a discussion about how the vessel could be brought into proper alignment for discharge. Fillette testified and Captain Sorros' signed statement of April 28, 1979, (Hess Ex. 33) verifies that Captain Sorros instructed the MARIAM's Master to slacken the forward lines in order to move the vessel into proper alignment. This movement was attempted without the assistance of a pilot and/or tugs and without making ready the vessel's engines. In view of the river's strong current and the difficulty experienced in docking the MARIAM, the Court finds Duchess' procedure in attempting to move the MARIAM into alignment simply by slackening the mooring lines, without the assistance of a pilot and tugs and without the availability of engines, was improper and negligent.

21. When the forward mooring lines were slackened, the MARIAM instead of floating downstream into proper alignment as Duchess' agents had hoped, drifted away from her secured berth as the current caught her port bow. (Hess Ex. 33)

The crew attempted to pull the MARIAM back to the dock by use of the vessel's winches. As the crew winched and tightened the forward mooring lines a tremendous stress was placed upon the lines being winched. Due to this extraordinary stress several of the vessel's mooring lines parted and as each line parted the stress upon the remaining lines simply increased. The parting of the mooring lines had the additional effect of allowing the MARIAM to move further away from the Hess terminal. Another result of using the MARIAM's winches to tighten the mooring lines was that four shore mooring bollards were pulled over and their support chains broken. (Duchess Ex. 6 through 19)

22. At approximately 2045, Fillette heard the very loud noise of mooring lines parting; this is described to sound like a shotgun blast. Shortly after the lines began parting, Captain Sorros requested Fillette to immediately order a pilot, two tugs and a linesman to come to the assistance of the MARIAM as her bow was being pushed further and further away from the dock. (Hess Ex. 33, Duchess Ex. 44, 49)

Around 2140, Captain John Gray, a Mobile Harbor Pilot, and two tugs, the DORIS MORAN and the CATHLEEN E. MORAN, arrived alongside the MARIAM. (Duchess Ex. 44, 49) Captain Gray testified that upon his arrival he found the MARIAM surging (or oscillating in and out from the dock. The two tugs were ordered to the starboard bow and began pushing on the MARIAM. The MARIAM's Master, her crew, Captain Gray and the two tugs worked together trying to get the vessel secured to the dock once again, but were

unable to get her closer than five feet to the dock or to stop the oscillation.

Captain Gray further testified that the MARIAM's Master was not pleased with the berth and wanted to leave the Hess terminal. The MARIAM's Master, however, was under the orders of Port Captain Sorros to remain at the berth.

23. Corrective efforts continued until approximately 0015 on April 26, 1979, when additional mooring lines began parting. As the lines parted, more and more stress was placed upon the remaining lines until about 0030, the MARIAM completely broke free of the Hess dock. The MARIAM drifted towards the east side of the Mobile River and came to rest against the bank about 0040. (Duchess Ex. 44, 49) There she remained anchored the rest of the evening. Pursuant to the United States Coast Guard's direction and for purposes of safety, a tug remained alongside the MARIAM all night. (Duchess Ex. 44, 49)

24. Around daylight on the morning of April 26, 1979, Captain W. K. Morgan, the Mobile Harbormaster, boarded the MARIAM and ordered her to be moved to Pier Number 2, Alabama State Docks, since she was blocking the port's turning basin. Under the direction of Captain Percy Manders, a Mobile Harbor Pilot, and with the assistance of four tugs, the MARIAM was shifted at approximately 1240 to Pier 2 without incident. The vessel reached Pier 2 around 1320 and Captain Manders testified that the MARIAM was securely tied to the pier, her engines turned off, and the assisting tugs dismissed. (Duchess Ex. 44) In tying up the MARIAM at Pier 2, as many as four mooring lines were attached to a single bollard. At approximately 1440 on April 26, the vessel's mooring lines began parting and shortly thereafter she broke completely away from Pier 2. (Duchess Ex. 44) Once again the MARIAM floated across the Mobile River and came to rest against the east bank there she remained anchored and assisted by at least one tug until 1130 on April 28, 1979. (Duchess Ex. 44)

25. On April 27, 1979, at approximately 1500, a conference was held in the United States Coast Guard's office, where it was determined that the MARIAM should be moved the next day, during the daylight hours, to the Mobile seabouy and remain anchored there until adequate discharge facilities could be arranged. (Duchess Ex. 44) After taking on additional fuel and freshwater, on April 28, 1978, at approximately 1130, the MARIAM with the assistance of five tugs, was moved to the Mobile seabuoy some 35 miles south of the Hess terminal.

26. The MARIAM returned to the Hess terminal on May 1, 1979, and was secured to the new docking facilities (See Findings of Fact Nos. 9 and 28) around 1540. Before discharge could begin, a Coast Guard inspection indicated several deficiencies which took approximately 28 hours to correct. After completing these repairs, discharge commenced on May 2, and was concluded on May 6, 1979. (Hess Ex. 16) Thereafter, on May 7, 1979, the MARIAM sailed from the Mobile port.

### Damages Incurred

27. Damages to the Hess terminal after the April 26, 1979, breakaway were surveyed by John Van Aken on behalf of the MARIAM and W. T. Ames, of the United States Salvage Association, Inc., on behalf of Hess. Both Ames and Van Aken issued written reports and cited damage to mooring bollards numbered 1, 3, 7, and 9. (counting north from the southern most bollard) They found the four damaged bollards to be either leaning or pulled over, with the tie back chains and/or fittings broken or distorted on bollards numbered 1, 3, and 7. Both noted a break in the concrete cap on the deadman adjacent to bollard number 3, and that the north breasting dolphin was missing a rubber bumper. Both estimated the cost of repairs to be approximately $30,000.00. Van Aken, however, testified that his estimate was based upon splicing a new H-Beam to part of the old H-Beam, and that due to the height of the river on April 26, 1979, such repairs were not feasible. Van Aken further testified that his estimate did not take into consideration the time that would be required to repair the damaged mooring system.

28. In order to prevent extensive delay in discharging the MARIAM, Hess decided to install a substitute mooring system. Instead of the nine H-Beam bollards, this new arrangement utilized four floating mooring buoys, two north and two south of the platform. Each mooring buoy floats out in the river about fifteen feet and is anchored by a forty foot long steel H-Beam piling driven into the ground, to which the buoy is fastened by a large chain. By working through the weekend, installation of the new mooring system was completed on April 29, 1979, and the Hess terminal was ready to receive the MARIAM once again.

Testimony indicated that the damaged bollards could not have been repaired until the river subsided and when this would have occurred was unpredictable. Even if repairs to the damaged bollards could have been begun on April 26th, at least ten days would have been required to allow the concrete repairs to properly cure, and this delay would have resulted in additional damages that were mitigated by installing the buoys and putting the terminal back in use on May 1, 1979. The Court finds the method of repair used by Hess was the best and fastest way to put the terminal back in operation and avoid additional off-hire days to the MARIAM.

29. If Duchess and its agents had acted prudently and carefully on April 25, 1979, then the MARIAM would have remained secured to the Hess terminal and Huron would have been liable for only normal port expenses, such as tugs and pilots to and from the berth. However, as of the time of the negligent attempt to move the MARIAM, pursuant to provision 9(b)(i) of the Time Charter Party the vessel went "off-hire" and consequently all port charges while the vessel remained off-hire were for owner's account pursuant to provision 19. (*See* Finding of Fact No. 5) Huron also paid charter hire during this period of off-hire and is entitled to reimbursement for this expense beginning at 2045 on April 25, 1979, and ending at 1540 on May 1, 1979.

30. On April 27, 1979, Van Aken conducted a class grounding survey on the MARIAM. No one from Hess, Huron, or Hess Trading was invited to or did attend this survey. Van Aken's survey revealed no ruptured tanks, no hull deficiency, and no damage to the vessel's machinery. Van Aken testified that he found no mud in the MARIAM's steam gathering system and that if any had been present it would have shown up immediately. He further indicated that while the mooring lines on the MARIAM only showed normal wear, there was dry rot present.

On July 10, 1979, the MARIAM was inspected by a diver on her starboard side. This underwater survey revealed no damage of any consequence to the MARIAM's starboard hull. (Hess Ex. 20)

31. On August 11, 1981, Duchess for the first time asserted a claim against Hess, Huron and Hess Trading for hull and machinery damage relating to the MARIAM's grounding of April 26, 1979. This claim was made some twenty-nine months after the alleged damage occurred and some twenty-two months after a drydocking of the MARIAM in October 1979, at which time if any damage had been sustained it should have and probably would have been discovered.

32. In September 1979, Captain Kosmos Fytas, Master of the MARIAM when she visited Mobile in the previous April, was dismissed by Duchess. This discharge occurred at a time when neither Hess, Huron, or Hess Trading had been put on notice of any possible hull or machinery damage claimed to have resulted from the Master's and Port Captain's negligent actions. Furthermore, Captain Fytas was not produced for deposition or for trial in spite of Hess' request.

33. The Court finds that Duchess and its agents are solely responsible for the damages suffered by Hess and Huron, and that any damages suffered by the MARIAM or its owners were caused solely by the combined negligence of the Master and the Port Captain in attempting to shift the MARIAM without taking proper precautions.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter, in Admiralty, and of all the parties and their claims, pursuant to 28 U.S.C. § 1333 (1976).

2. The Court has made detailed findings concerning the events and agreements leading up to and following the MARIAM's breakaway on April 26, 1979. To the extent that these findings also constitute legal conclusions, they are incorporated herein.

■ 3. During the course of the trial, Duchess did not offer the testimony of any member of the MARIAM's crew, her Master, or the Port Captain.[1] Of particular interest is the fact that Port Captain Sorros, who was present and in command of the MARIAM once she reached the Hess terminal, was also present in Mobile during Duchess' evidentiary presentation, but was not called as a witness. While the Court is aware that whether or not to call Captain Sorros as a witness is a judgment decision, it is also aware of the general maritime rule that, "[f]ailure to produce important witnesses in an admiralty action may raise the inference that the testimony would have been unfavorable to the party by whom they should have been called." *American Oil Co. v. M/T Lacon*, 398 F.Supp. 1181, 1186 (S.D.Ga.1973), *aff'd mem.*, 518 F.2d 1405 (5th Cir. 1974) (citations omitted). In this case, Captain Sorros was one of two witnesses present on the Hess terminal from the time the MARIAM arrived and until after she broke away. Testimony further indicated that Captain Sorros gave the negligent order to move the MARIAM without the assistance of tugs, a pilot, or readiness of engines. Clearly Captain Sorros must be considered an important witness, whose testimony would have been unfavorable to Duchess.

■ 4. The Fifth Circuit in *Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A.*, 521 F.2d 229 (5th Cir. 1975), stated that the standard of care applicable to a wharfinger such as Hess was:

... that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner. But, there is no duty on the part of a wharfinger to provide a berth with safe surroundings ... or to warn that hazards exist in its vicinity, since it is common knowledge that a ship severed from its berth, adrift and not in command, runs a substantial risk of grounding.

*Id.* at 230. (citations omitted). The Court further stated in *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir. 1977), that:

[t]he wharfinger's duty to warn applies only to 'any hidden hazard or deficiency ... not reasonably known to shipowner' .... Thus, no warning is required 'where the alleged obstruction or condition is *open and obvious* to those in charge of the vessel's management' or where those in control of the vessel have actual knowledge. *General Construction Co. v. Isthmian Lines, Inc.*, 259 F.Supp. 336, 339 (D.Or.1966). *See also Sabine Towing and Transportation Co. vs. St. Joe Paper Co.*, 297 F.Supp. 748 (N.D.Fla. 1968).

*Id.* at 795. (emphasis added) Clearly the condition of the Mobile River and of the Hess terminal on April 25, 1979, was open and obvious to both the Master and Port Captain of the MARIAM, thus imposing no duty on Hess to give any warning. The Court finds that Hess legally met its duty as a wharfinger.

■ 5. In the present case the Court finds that the MARIAM was securely tied to the Hess terminal as of 1945 on April 25,

---

**1.** All the MARIAM's crew and her Master were foreign nationals and not within the subpoena power of this Court, therefore no other party was in a position to offer their testimony.

1979. (*See* Finding of Fact 18) Thereafter the MARIAM's Master, acting upon the instructions from Port Captain Sorros on the dock, negligently attempted to move his vessel in an obviously strong current without the assistance of tugs, a pilot, and when the main propulsion engine was shut down and not available to answer bells. This movement was performed by slackening the forward lines that had held the vessel secured to the dock. By slackening the mooring lines the vessel was set adrift and was never again properly secured to the Hess terminal prior to her breakaway around 0030 on April 26, 1979.

6. The position taken by Duchess was that the Hess terminal failed because the mooring facility was inadequate. Duchess offered evidence that a stronger mooring configuration could have been utilized at the Hess terminal. As the Fifth Circuit noted in *Trade Banner, Inc. v. Caribbean Steamship Co., S.A.,* 521 F.2d 229 (5th Cir. 1975):

> [t]he fact that the fittings at the bauxite pier might have been more nearly adequate had the uprights of the double bitts been at an angle or had the double bitts on its east side been unobstructed does not alter the situation. All details of the mooring of [the vessel] were controlled by the ship's crew under the supervision of her master. Under the circumstances, responsibility for the mooring of the vessel lay with [the master].

*Id.* at 231. The Court finds that Duchess made no effort to show that it was without fault, but preferred to attempt to shift the blame by use of expert testimony showing the terminal was not the best possible berth. Hess met Duchess testimony with its own experts, and the Court, having considered all expert testimony, concludes that the mooring facility at the Hess terminal was sufficient for the MARIAM at the time of her arrival and constituted a safe berth in a safe port.

In all cases where the wharfinger has been found liable for a breakaway, the vessel's owner has been able to prove that a substantial defect exist in the mooring system, whereas here, no defect which is causally related to the breakaway has been proven. It must be remembered that the requirement placed upon the wharfinger is not to provide the best imaginable dock or mooring facility, but to provide one which reasonably and adequately meets its intended purpose. The Court, therefore, concludes that the mooring system was damaged, but did not fail as is evidenced by the number of broken mooring lines still attached to the mooring bollards. Furthermore, the Hess terminal was sufficient for its intended use and if the MARIAM had not put herself in motion, the bollards would not have been damaged and the vessel would not have broken away and grounded.

7. The proximate cause of the casualty was the negligent operation of the MARIAM and her violations of the practices of good seamanship in the face of a known and obvious strong current. Duchess and the MARIAM are held in sole fault for this casualty and must bear the cost of all damages resulting therefrom. The Court finds that Hess, Huron and Hess Trading are exonerated of all alleged liability.

8. The fact that the MARIAM was under time and voyage charter does not relieve Duchess of its liability or allow it to shift its liability to the charterers. The accepted maritime rule is that "[u]nder a voyage charter, the shipowner retains full control over the navigation and operation of the vessel" and is required "to exercise a high degree of care in accordance with the skill necessary in the control and management of a modern oceangoing tankship to avoid injury to the docking facility" and itself. 558 F.2d at 799.

Within the meaning of Provision 9 of the Time Charter (*See* Finding of Fact No. 5) the MARIAM went "OFF-HIRE" as soon as Port Captain Sorros and Captain Fytas released the lines securing the vessel to the Hess terminal, without the assistance of tugs and a pilot, and without the engines being placed on standby. This negligent decision placed the vessel off-hire as of that

time pursuant to Provision 9(b)(i), since the action caused "loss of time" which was "due to neglect of duty on the part of the Master, officers or crew." This off-hire commenced at approximately 2045 on April 25, 1979, and continued until the MARIAM returned to the Hess terminal on May 1, 1979, at approximately 1540. Since Huron was improperly charged and paid charter hire for this period during which the vessel was off-hire. Huron is entitled to be reimbursed for this overpayment.

Likewise, pursuant to Provision 19 of the Time Charter (*See* Finding of Fact No. 5) port expenses during periods of off-hire are not for the account of the charterer. Since Huron paid these port expenses, Duchess is liable to Huron for reimbursement of all port expenses on which the parties can agree or the Court finds at a subsequent hearing were reasonably and necessarily incurred during the off-hire period.

9. Since any damages resulting from the alleged grounding of the vessel on the east bank of the Mobile River following the breakaway were the direct and proximate result of the negligence of the Port Captain Sorros and Captain Fytas, and not the fault of any of the other parties in this lawsuit, any and all damages which may have arisen out of the alleged grounding must be for the account of Duchess.

10. By agreement and stipulation of all the parties, only the issue of liability was tried before the Court, consequently, the Court does not make a determination as to the issue of damages. The parties are directed to file a stipulation as to damages within 30 days from the entry of this Judgment, failing this, a hearing will be set to determine the issue of damages.

A Judgment will be forthwith entered in accordance with the above Findings of Fact and Conclusions of Law.

## JUDGMENT

The Court having entered its Findings of Fact and Conclusions of Law herein, it is therefore ORDERED, ADJUDGED and DECREED that:

1. Duchess is found to be liable to Hess for all damages resulting to its docking facility from the MARIAM's breakaway on April 26, 1979;

2. Duchess is found to be liable to Huron for reimbursement of all erroneously paid charter hire and port expenses which the Court finds to be reasonably and necessarily incurred during the period of off-hire commencing at 2045 on April 25, 1979, and ending at 1540 on May 1, 1979.

3. Duchess is found not to be entitled to recover for any damages which the MARIAM might have sustained from its April 26, 1979, grounding.

4. Hess, Huron, and Hess Trading are found to be exonerated from any alleged liability resulting from the April 26, 1979, breakaway of the MARIAM.

## AMENDED JUDGMENT

The Court having entered its Findings of Fact and Conclusions of Law herein on the 19th day of January, 1982, and having further entered its Order amending said Findings of Fact and Conclusions of Law, it is therefore ORDERED, ADJUDGED and DECREED that:

1. Duchess is liable to Hess and judgment is entered in favor of Hess and against Duchess in the amount of SIXTY-EIGHT THOUSAND ONE HUNDRED SIXTY-SEVEN AND 20/100THS DOLLARS ($68.167.20) together with prejudgment interest at the rate of TEN PERCENT (10%) per annum from April 26, 1979, until this judgment is paid, and costs;

2. Duchess is liable to Huron for reimbursement of all erroneously paid charter hire and port expenses in the amount of NINETY-FOUR THOUSAND TWO HUNDRED SIXTY AND 80/100THS DOLLARS ($94,260.80) together with prejudgment interest thereon at the rate of TEN PERCENT (10%) per annum from May 1, 1979 until the date this Judgment is paid, and costs.

3. Duchess is found not to be entitled to recover for any damages which the MARIAM might have sustained from its April 26, 1979, grounding.

4. Hess, Huron, and Hess Trading are found to be exonerated from any alleged liability resulting from the April 26, 1979 breakaway of the MARIAM.

## ORDER

The Court having received and considered the Motion to Amend Findings of Fact, Conclusions of Law and Judgment heretofore entered by this Court on January 19, 1982 filed by Amerada Hess Corporation and Huron Liberian Company, after hearing argument by counsel for all parties, hereby grants the motions to amend to the extent indicated herein and amends the Findings of Fact, Conclusions of Law, and Judgment as follows:

1. Finding of Fact Number 28 is amended by adding the following sentence:

The Court finds that the $68,167.20 cost of repair paid by Amerada Hess Corporation was a fair and reasonable amount and that, under the evidence, prejudgment interest at the rate of 10% per annum is reasonable.

2. Finding of Fact Number 29 is amended by deleting the last sentence and substituting therefor:

The Court finds that while the M/T MARIAM was off-hire, Huron necessarily and reasonably paid extra port charges in the amount of $36,713.23. Huron also paid charter hire during this period of off-hire and is entitled to reimbursement for this expense beginning at 2045 on April 25, 1979, and ending at 1540 on May 1, 1979. This overpayment of charter hire was in the amount of $57,547.57. The Court finds that under the evidence 10% per annum prejudgment interest is reasonable.

3. Conclusion of Law Number 8 is modified and amended by deleting the two last sentences in paragraph 2 and substituting therefor the following:

Since Huron was improperly charged and paid charter hire for this period during which the vessel was off-hire, Huron is entitled to be reimbursed for this overpayment in the amount of $57,547.57 together with prejudgment interest at 10% per annum.

Conclusion of Law Number 8 is further amended by deleting the last sentence of paragraph 3 of said Conclusion of Law and substituting therefor the following:

Since Huron paid these port expenses, Duchess is liable to Huron for reimbursement in the amount of $36,713.23, together with prejudgment interest at 10% per annum.

4. Conclusion of Law Number 10 is withdrawn and in its place is substituted the following:

Duchess is liable to Hess in the amount of $68,167.20 together with prejudgment interest at the rate of 10% per annum to run from April 26, 1979, as set out in Finding of Fact 28.

5. The original judgment entered in this cause on January 19, 1982, is hereby withdrawn and in its place and stead is entered the Amended Judgment signed this date effective as of the 10th day of January, 1982.